## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **MARIE ETTINOFFE and SAMUEL** | § | |
| **ETTINOFFE, co-guardians of the estate** | § | |
| **of CURVIN C. ETINOFFE,** | § | |
| **INCAPACITATED,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **C.A. No. 4:21-cv-02646** |
| | § | **(Jury)** |
| **OFFICER M. SHEIKH,** | § | |
| **OFFICER R. GUZMAN,** | § | |
| **OFFICER E. TOBIAS,** | § | |
| **OFFICER OMOJOLA,** | § | |
| **OFFICER V. ROMERO,** | § | |
| **and the CITY OF HOUSTON,** | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, MARIE ETTINOFFE and SAMUEL ETTINOFFE, co-guardians of the estate of CURVIN C. ETINOFFE, INCAPACITATED, PLAINTIFF (hereinafter collectively, "Plaintiff"), in the above-styled and above-numbered cause, and file this Plaintiffs' Third Amended Complaint, complaining of and against OFFICER M. SHEIKH; OFFICER R. GUZMAN; OFFICER E. TOBIAS; OFFICER OMOJOLA; and OFFICER V. ROMERO (hereinafter collectively, "Defendant Officers"); and the CITY OF HOUSTON,

DEFENDANTS (hereinafter collectively, "Defendants"), and in support thereof would respectfully show unto the Honorable Court and Jury the following:

## I. PARTIES

1.      PLAINTIFF, CURVIN C. ETINOFFE, is an individual who resides in Harris County, Texas.  He is incapacitated, and is represented by and through MARIE ETINOFFE and SAMUEL ETINOFFE, who are co-guardians of the estate.

2.      DEFENDANT, OFFICER M. SHEIKH, is a Houston Police Department Officer and is being served in his official and individual capacity. This Defendant may be served with process by serving City of Houston City Secretary, Pat Jefferson Daniel, 900 Bagby Street, Rm. P101, Houston, Texas 77002.

3.      DEFENDANT, OFFICER E. TOBIAS, is a Houston Police Department Officer and is being served in his official and individual capacity. This Defendant may be served with process by serving City of Houston City Secretary, Pat Jefferson Daniel, 900 Bagby Street, Rm. P101, Houston, Texas 77002.

4.      DEFENDANT, OFFICER R. GUZMAN, is a Houston Police Department Officer and is being served in his official and individual capacity. This Defendant may be served with process by serving City of Houston City

Secretary, Pat Jefferson Daniel, 900 Bagby Street, Rm. P101, Houston, Texas 77002.

5.     DEFENDANT, OFFICER OMOJOLA, is a Houston Police Department Officer and is being served in his official and individual capacity. This Defendant may be served with process by serving City of Houston City Secretary, Pat Jefferson Daniel, 900 Bagby Street, Rm. P101, Houston, Texas 77002.

6.     DEFENDANT, OFFICER V. ROMERO, is a Houston Police Department Officer and is being served in his official and individual capacity. This Defendant may be served with process by serving City of Houston City Secretary, Pat Jefferson Daniel, 900 Bagby Street, Rm. P101, Houston, Texas 77002.

7.     DEFENDANT, CITY OF HOUSTON, is a governmental unit in the State of Texas and is the employer of Defendants Officer M. Sheikh, Officer Omojola, Officer E. Tobias, Officer R. Guzman, and Officer V. Romero. The City of Houston may be served with process through its City Secretary, Pat Jefferson Daniel, 900 Bagby Street, Rm. P101, Houston, Texas 77002.

## II. JURISDICTION

8.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C § 1331, because the claims involve a question of federal law under 42 U.S.C. § 1983.

### III. VENUE

9,     Venue is proper in this cause in the Southern District of Texas pursuant to 28 U.S.C. § 1391(a)(2) because all or substantial part of the events which gave rise to this cause of action occurred in the Southern District of Texas.

### IV. FACTS

10.     After the night of August 19, 2019, the excessive force and brutal conduct of Officer Sheikh and other Houston Police Department officers, Mr. Curvin Ettinoffe was left essentially brain dead, paralyzed, and would never again enjoy a day in his life walking, talking, or otherwise enjoy life as he had!

11.     Officers were dispatched to a call of a possible theft occurring at a CVS store located on South Post Oak and West Orem.

12.     The officers arrived at the scene.

13.     Officers Sheikh and Romero were some of the first to arrive.

14.     Officers Sheikh and Romero spot the plaintiff on foot near the CVS.

15.     An officer yells, "he's running southbound!"

16.     Without any knowledge of the surrounding circumstances or if Plaintiff had a weapon, Officer Sheikh yells to Officer Romero, "you go gun and I'll go taser!"

17.     They jump out of the vehicle and start screaming to "get on the f***ing ground!"

18.   Without any knowledge of the surrounding circumstances or if Plaintiff had a weapon, Officer Sheikh can be heard yelling "pop him, pop him!"

19.   They pursued Plaintiff on foot and violently tased him multiple times.

20.   During this commotion, Officer Sheikh, without any valid lawful reasoning, slammed Plaintiff to the ground using excessive force, by his neck.

21.   Officer Sheikh tells the other officer as they're wrestling with Plaintiff, "grab his feet!"

22.   At this point, there are multiple officers using an excessive force in restraining Mr. Ettinoffe, restricting Mr. Ettinoffe's movements, and holding Mr. Ettinoffe down with no lawful reason.

23.   Officer Sheikh said, "let me see his legs, let me see his legs, now he ain't f***ing moving", for no lawful reason.

24.   Once Plaintiff was face down on the ground, without any lawful reasoning, at least three if not more officers were using their full body weight, handcuffs, and zip ties to restrain Mr. Ettinoffe's movement.  Not a single Officer intervened.

25.   Mr. Ettinoffe's legs were restrained.

26.   Mr. Ettinoffe's hands were restrained behind his back.

27.   During the duration of the entire course of events, Officer Sheikh had an unlawful technique in place on Mr. Ettinoffe when Officer Sheikh had his knee

on Plaintiff's neck, constantly applying excessive amounts of pressure.   Not a single Officer intervened.

28.   One of the restraining officers can be heard giddily saying, " Nah, he ain't f***ing moving."

29.   This same neck restraint or hold that Officer Sheikh used, with no lawful purpose, are referred to are either unlawful or unauthorized in most if not all jurisdictions unless DEADLY FORCE is authorized.

30.   The holds at issue, commonly used by Houston Police Department Officers, here are the Choke hold and the Carotid hold.   One restrains breathing and the other blood flow.   Both are extremely dangerous, should be avoided, and were used unlawfully against Mr. Ettinoffe.

31.   The choke hold is the more dangerous of the two, which is the type Officer Sheikh applied to Mr. Ettinoffe while he was faced down and hogtied. This excessive force was unnecessary, unwarranted, and unlawful.

32.   The purpose of these holds is to render someone unconscious if deadly force is authorized.   Deadly force was not authorized in this situation.

33.   Mr. Ettinoffe posed zero threat to the officers as he had already been restrained and was hogtied face down in the dirt with multiple officers holding him down.

34.     Mr. Ettinoffe being held in a choke hold face down is extremely dangerous as officers well know, because it can lead to Positional Asphyxia.

35.     Officers, including Houston Police Department Officers, are to turn people on their sides once they are handcuffed and under control to avoid, Positional Asphyxia, in which breathing becomes labored in a prone position and can lead to death.  None of which was done.

36.     After Mr. Ettinoffe had been lying face down and not moving for a while, one of the officers said, "he ain't moving, wanna sit him up?"

37.     Seven minutes later, the officers finally lifted Mr. Ettinoffe up and one officer responded, "I don't think he's breathing man."

38.     Officers could not find a pulse.

39.     At this point, Officer Sheikh says, "Oh please, God, no."

40.     EMTs arrived at the scene, and tried to figure out how long Mr. Ettinoffe had been unconscious.

41.     When EMTs arrived, Mr. Ettinoffe was still handcuffed.

42.     EMTs performed at least two cycles of CPR.

43.     At this time, an officer can be heard in the background saying, "It doesn't look like he's going to make it."

44.     Miraculously, EMTs were finally able to get a pulse.

45.    Mr. Ettinoffe was then taken to Pearland Memorial Hospital in an ambulance.

46.    Houston Police Department Sergeants arrived on the scene told all the officers who had used force to remain at the scene as Internal Affairs Division (hereinafter "IAD") representatives were on their way to question them.

47.    Houston Police Department Sergeants also questioned the various officers involved.

48.    Without any knowledge of the surrounding circumstances or if Mr. Ettinoffe even had a weapon, and in an attempt to ratify the excessive force conduct, Houston Police Department Sergeants were vigorously and hopelessly repeatedly asking the officers present where was the gun, as they had been told that the Mr. Ettinoffe had a gun.

49.    One particular Houston Police Department Sergeant can be heard speaking with an officer asking if there was a gun involved, and the voice on the other end says, "No gun involved."

50.    The Houston Police Department Sergeant then says, "No gun involved, then how did he commit the robbery?"

51.    The Houston Police Department Officer responds saying, "He took the cell phone and ran from somebody, so it was a theft. It was theft, not a robbery."

52.     In attempt to cover up his excessive force conduct, Officer Sheikh futily tries to tell his Sergeant, "This guy has a f***ing gun, I'm telling you, somewhere", no gun or even a weapon was found.

53.     Houston Police Department Officers can be heard talking about Mr. Ettinoffe just hanging out and running around after the theft and him probably being homeless.

54.     A Houston Police Department Sergeant questions the CVS shift manager and employee what happened and what they saw.

55.     Neither the CVS shift manager nor the employee ever mentioned seeing a gun.

56.     After questioning all of the officers and CVS personnel about the alleged gun, the officers later realized that the Mr. Ettinoffe never had a gun nor any other type of weapon.

57.     In another attempt to cover up and ratify the excessive force conduct of Officer Shiekh, a Houston Police Department Sergeant's questioning Officer Romero stated, "We want policy."

58.     At this point, Officer Sheikh realizes that his actions have turned to disaster and starts trying to justify his excessive force actions to his fellow Houston Police Department Officers and the Houston Police Department Sergeants present.

59.     Officer Sheikh called someone on his personal radio and said, "Bro, I need a solid right now.  I've gotten into some shit.  The guy might not make it. That's all I can say, ok.  No, on duty.  This mother***er  might not make it dude…the suspect.  I did what I had to do.  I'll just call you back all right."

60.     Officer Sheikh can also be heard saying to others, "Bro I had to do what I had to do, you know what I'm saying."

61.     Officer Sheikh then begins to change his story.

62.     Officer Sheikh can also be heard saying, "Bro, this mother***er was pulling on my partner, that's why I had to hit his ass!"

63.     Officer Sheikh continued, "No one is going to pull on my partner, I did what I had to do."

64.     While talking to a Houston Police Department Sergeant, Officer Sheikh admits, "That's when I grabbed his throat and did what I did."

65.     Officer Sheikh then admits, "I lost my shit man."

66.     The Houston Police Department Sergeant told Officer Sheikh that in his opinion, he was justified in using his taser, but says that the place he's got to be careful is with applying pressure to the neck area.

67.     Officer Sheikh is later heard saying, "I gotta smoke right now, I'm in that fighting mode."

68.   The Houston Police Department Sergeant asks Officer Sheikh if he's ok, and Sheikh replies, "You know me, I handle business!"

69.   The Houston Police Department Sergeant replies, "You sure hadn't been handling business lately."

70.   To add insult to the lifelong injuries, the Houston Police Department Sergeant, Officer Sheikh, and other Officers can be heard making jokes about when they found out Mr. Ettinoffe wasn't breathing.

71.   After that, Officer Sheikh admitted to one of the Houston Police Department Sergeants, "Having his hand to his neck area and admits to pressing down." Sheikh claims Mr. Ettinoffe was face up at that time."

72.   Officer Sheikh comes back and further admits to the Sergeant, "I take my knee and apply pressure to his neck." While Mr. Ettinoffe is on his face.

73.   Not a single Houston Police Department Officer at the scene with Officer Sheikh attempted to stop Officer Sheikh or acknowledged any type of misconduct.

74.   Mr. Ettinoffe has suffered great pain, anxiety, fear, will be paralyzed from the neck down for the remainder of his life, and will have to live with these injuries forever.

75.   These incidents are sadly commonplace for the Houston Police Department.

76.     The City of Houston Police Department has a long and documented history of abiding instances of excessive force in a wide variety of circumstances, both in that officers routinely use more force than is necessary in a given situation, and in that the City will keep evidence and investigations out of the public eye, and let offending officers continue to serve with no consequences. The latter custom of turning a blind eye to excessive force emboldens officers to use any amount of force with prejudice, and without fear of professional repercussions; Plaintiff provides these numerous above examples, dating back decades, of uses of excessive force that have gone almost completely unpunished and unaddressed by HPD, to illustrate just how pervasive and long-standing this culture and pattern of excessive force is in the HPD.

77.     This culture and pattern of abiding and secreting away instances of excessive force was known and perpetuated by then-Chief Art Acevedo. He (in)famously kept information and videos about six police shootings in Houston internal, except for summaries of the events that best suited the City's image. One of those instances described the victim as charging at the police when he was shot, whereas later-released cell phone footage showed him on his knees when he was shot. This issue was well covered by reputable national news outlets such as NBC News, as well as local outlets such as the Houston Chronicle (exemplary articles found in hyperlinks). As the Houston Chronicle put it: "None of Houston's six

shooting seem to rise to the egregious level of abuse and brutal indifference that caused the death of George Floyd in Minneapolis, but history and the persistent pattern of such tragedies has taught us not to rely exclusively on Acevedo's verbal assurances."

78.    In 2008, City of Houston employees severely beat Charles Chukwu in a Houston city jail.

79.    There was an Internal Affairs Department ("IAD") investigation.

80.    Nobody was disciplined.

81.    In 2009, City of Houston employees severely beat Trenton Garrett in a Houston city jail.

82.    There was an IAD investigation.

83.    Nobody was disciplined.

84.    In 2014, HOD Officer S. Corral used excessive force on Rueben Williams when he smashed Williams's head into an iron jail cell door.

85.    Similar to Officer Sheikh's excessive force conduct when he choked the life out of Mr. Ettinoffe in the instant matter, Officer Corral applied a chokehold on Williams.

86.     This occurred until Williams passed out.

87.    Williams was falsely accused and charged with felony harassment of a public servant.

88.     This ostensibly was because of Williams spitting on Officer Corral.

89.     No DNA evidence was reviewed.

90.     This charge was dismissed.

91.     No discipline to Officer Corral resulted.

92.     In 2016, City of Houston employee Lasswon Shannon severely beat Akrem Azzam in a Houston city jail.

93.     City of Houston employee Sheila Ross tolerated this behavior.

94.     Upon information and belief, over the last 13 years there have been more than 250 instances, from 2005 to 2018, of HPD Officers wounding or killing people with no resulting discipline, despite clear excessive use of force.

95.     On July 21, 2000, HPD Officers severely beat Wanda Brent in a Houston city jail.

96.     Upon information and belief, no discipline occurred.

97.     Houston Chief of Police Art Acevedo—along with past Chiefs of Police and staff back to at least January 1, 2000—were aware of the many instances of excessive force at the jail and elsewhere that were unjustified but have not retrained or disciplined officers such that excessive force remains a custom and practice at the Houston City jails and elsewhere.

98.     On February 17, 2007, City of Houston employees used excessive force upon Steven Mikeasley in a Houston city facility.

99.    Upon information and belief, no discipline occurred.

100.   On June 5, 2007, Houston Police Department ("HPD") Officers used excessive force upon Brian Golott in a Houston city jail when he was pushed up against a wall and hogtied.

101.   Upon information and belief, no discipline occurred.

102.   On September 23, 2007, HPD Officers used excessive force on an unascertained detainee in a Houston city jail without reason.

103.   Upon information and belief, no discipline occurred.

104.   On November 19, 2007, HPD Officers used excessive force upon Hasan Matthews in a Houston city jail when he was suddenly taken down.

105.   Upon information and belief, no discipline occurred.

106.   On January 27, 2008, HPD Officers used excessive force upon Samuel Smith in a Houston city jail without reason when he was taken down while on the phone.

107.   Upon information and belief, no discipline occurred.

108.   On April 4, 2008, at least six HPD Officers used excessive force upon Alexandra Koch in a Houston city jail with they wrestled her without any reason.

109.   Upon information and belief, no discipline occurred.

110.   On May 26, 2008, HPD Officers used excessive force upon Kenneth Cert in a Houston city jail.

111.   Upon information and belief, no discipline occurred.

112.   On June 5, 2008, HPD Officers used excessive force upon Nakia Stark in a Houston city jail.

113.   Upon information and belief, no discipline occurred.

114.   On June 21, 2008, HPD Officers used excessive force upon Jeffrey Clark.

115.   Upon information and belief, no discipline occurred.

116.   On June 21, 2008, three HPD Officers used excessive force upon an unascertained detainee, identified as a man in a yellow shirt and red visor, in a Houston city jail is taken down without reason.

117.   Upon information and belief, no discipline occurred.

118.   On July 26, 2008, HPD Officers severely beat and punched Clyde Jones in a Houston city jail without reason.

119.   Upon information and belief, no discipline occurred.

120.   On September 30, 2008, HPD Officers severely beat Furrell Holmes in a Houston city jail.  The HPD Officers take him down and later alter the video footage.

121.   Upon information and belief, no discipline occurred.

122.   On October 18, 2008, HPD Officers severely beat an unascertained detainee in a Houston city jail when they punched and kicked him without reason.

123.   Upon information and belief, no discipline occurred.

124.   On December 28, 2008, three HPD Officers came into the Houston city jail with an unascertained detainee whose head had been recently bloodied.

125.   Upon information and belief, no discipline occurred.

126.   On January 17, 2009, five HPD Officers used excessive force upon Timothy Peavy in a Houston city jail when he was held up against the wall handcuffed and taken down after being handcuffed.

127.   Upon information and belief, no discipline occurred.

128.   On April 12, 2009, HPD Officers used excessive force upon Oliver Nicholas when he was suddenly on the ground and the video was later altered.

129.   Upon information and belief, no discipline occurred.

130.   Similar to Officer Sheikh's excessive force conduct when he choked the life out of Mr. Ettinoffe in the instant matter, on August 23, 2009, HPD Officers used excessive force and choked an unascertained detainee.

131.   Upon information and belief, no discipline occurred.

132.   Similar to Officer Sheikh's excessive force conduct in the instant matter, on October 13, 2009, HPD Officers used excessive force upon C. Whitley to get Whitley under control.

133.   Upon information and belief, no discipline occurred.

134.   On December 12, 2009, HPD Officers used excessive force upon Eric Cossie when he was thrown down by the neck despite Mr. Cossie not fighting back, similar to Mr. Ettinoffe.

135.   Upon information and belief, no discipline occurred.

136.   On February 13, 2010, HPD Officers used excessive force upon David Compean.

137.   Upon information and belief, no discipline occurred.

138.   On March 3, 2020, HPD Officers used excessive force upon a Mr. Cooper in a Houston city jail.

139.   Upon information and belief, no discipline occurred.

140.   On May 3, 2010, HPD Officers used excessive force upon a David Luke in a Houston city jail.

141.   Upon information and belief, no discipline occurred.

142.   On August 12, 2010, a HPD Officer severely beat a W. Cotley in a Houston city jail.

143.   Upon information and belief, no discipline occurred.

144.   On August 15, 2010, HPD Officers used excessive force upon a Mr. Harrison in a Houston city jail when they put him in handcuffs and break his arm.

145.   Upon information and belief, no discipline occurred.

146.   On March 16, 2011, HPD Officers used excessive force upon Lewis Henderson in a Houston city jail when he is taken down and put in handcuffs without reason.

147.   Upon information and belief, no discipline occurred.

148.   On April 27, 2011, HPD Officers used excessive force upon Donald Brooks in a Houston city jail when he was placed in handcuffs and dragged by the handcuffs.

149.   Upon information and belief, no discipline occurred.

150.   On June 24, 2011, HPD Officers used excessive force upon Charles Perez in a Houston city jail he was taken down for taking a step forward.

151.   Upon information and belief, no discipline occurred.

152.   On October 24, 2011, a City of Houston employee used excessive force upon Pedro Barrero in a Houston city jail without reason.

153.   Upon information and belief, no discipline occurred.

154.   Upon information and belief, from 2004 to 2018, about 450 HPD Officers have been involved in killing or wounding civilians.

155.   Not a single HPD Officer was indicted.

156.   Not a single HPD Officer was disciplined after an IAD investigation.

157.   About one-quarter (25 percent) of these incidents involved unarmed civilians.

158.   In December, 2016 new Houston Police Chief Acevedo stated he was creating a special HPD unit apart from homicide to investigate situations such as shootings of civilians.

159.   On October 1, 1998, HPD Officer Anthony M. Ruggeroli and Officer Brian T. Mitchel used excessive force upon Houstonians.   Specifically, the Officers shot at a vehicle, smashed the vehicle window, and sought to seize the passengers therein.   The Officers were not disciplined or retrained, indicating ratification and acceptance of HPD's patterns, practices, customs and/or procedures of the excessive force.

160.   In 1999, HPD Sgt. Glover used his gun to smash a vehicle window. The gun fired and struck a passenger.   Sgt. Glover then shot the other passenger.

161.   Sgt. Glover faced no discipline despite the excessive force.   The Officers were not disciplined or retrained, indicating ratification and acceptance of HPD's patterns, practices, customs and/or procedures of the excessive force.

162.   In 1999, HPD Officer R.A. Williams used excessive force upon Jason Arboleda when he shot and killed Arboleda.

163.   Officer Williams was never disciplined for his excessive force or retrained, indicating ratification and acceptance of HPD's patterns, practices, customs and/or procedures of the excessive force.

164.  In 2000, HPD Officer R.C. Headley shot a Mr. Langston and a Mr. Plumbar without reason or justification, and neither had a weapon, thereby using excessive force.

165.  Officer Headley was not disciplined or retrained, indicating ratification and acceptance of HPD's patterns, practices, customs and/or procedures of the excessive force..

166.  In 2002, HPD Officer Ted A. Adams, who had 41 previous complaints, used excessive force upon a civilian by using a leg sweep that knocked down the civilian onto the pavement.

167.  Officer Adams received a mere one-day suspension.

168.  In 2003, HPD Lt. Hillman shot and killed Kevin Lunsford, who was unarmed.

169.  Lt. Hillman used excessive force upon Lunsford.

170.  Lt. Hillman was not disciplined or retrained on excessive force, indicating ratification and acceptance of HPD's patterns, practices, customs and/or procedures of the excessive force..

171.  On October 31, 2003, HPD Officer Butler shot and killed 15-year-old Jose Vargas, who was unarmed who was playing his radio too loud and not obeying commands.

172.  Officer Butler used excessive force upon Vargas.

173.   Officer Butler was not disciplined or retrained on excessive force, indicating ratification and acceptance of HPD's patterns, practices, customs and/or procedures of the excessive force.

174.   In 2003, HPD Officer R. L. Plotner shot and killed Juan Lozano.

175.   Officer Plotner used excessive force by improperly shooting and killing Lozano without proper justification, fear of his life.

176.   Officer Plotner was not disciplined or retrained in excessive force, indicating ratification and acceptance of HPD's patterns, practices, customs and/or procedures of the excessive force.

177.   In 2003, HPD Officer Rivera shot and killed a Houstonian despite not being in proper fear of his life.

178.   Officer Rivera used excessive force.

179.   Officer Rivera was not disciplined or retrained in excessive force, indicating ratification and acceptance of HPD's patterns, practices, customs and/or procedures of the excessive force.

180.   In 2004, HPD Officer C. Pena Jr. shot an unarmed 16-year-old LaDonna Banks.

181.   Officer Pena used excessive force.

182.   Officer Pena was not disciplined or retrained in excessive force, indicating ratification and acceptance of HPD's patterns, practices, customs and/or procedures of the excessive force.

183.   In 2005, HPD Officer Thompson shot Timothy M. Thomas, who posed no lethal danger and was unarmed.

184.   Officer Thompson used excessive force.

185.   Officer Thompson was not disciplined or retrained in excessive force, indicating ratification and acceptance of HPD's patterns, practices, customs and/or procedures of the excessive force.

186.   On August 14, 2007, HPD Officer Carraway shot an unarmed 17-year-old Brittanee King when she was accused of *littering*.   Officer Carraway claimed fear for his life as justification.

187.   Officer Carraway used excessive force.

188.   Officer Carraway was not disciplined or retrained in excessive force, indicating ratification and acceptance of HPD's patterns, practices, customs and/or procedures of the excessive force, despite an IAD investigation.

189.   On June 22, 2008, an HPD Officer severely beat Henry Lee Madge in a Houston city jail while he was in handcuffs, similar to the excessive force used on Mr. Ettinoffe when he was handcuffed and hogtied.

190.   The HPD Officer used excessive force.

191.   The HPD Officer was not disciplined.

192.   On August 5, 2009, HPD Officers used excessive upon Dr. Hatice Cullingford in a Houston city jail and were not justified in their conduct.

193. The HPD Officers were not disciplined.

194.   In 2010, HPD Officers severely beat 15-year-old Chad Holley after purposefully hitting Mr. Holley with their patrol cruiser.   The Officers then stomped and punched Mr. Holley.   He was not resisting nor did any Officer attempt to stop the unlawful excessive force conduct.

195.   The Officers used excessive force upon Mr. Holley and when a video surfaced the then Mayor of Houston, Annise Parker, threatened the citizen and news outlet for releasing the video.   Moreover, the Houston City Councilpersons discussing Mr. Holley's case and other excessive force incidents when the then Houston City Attorney and instructed the City Counsel not to discuss the Holley case or excessive force incidents.

196.   All of the foregoing instances involved detainees and all involved excessive force conduct, like that used against Mr. Ettinoffe, but none were disciplined.

197.   The foregoing establishes a clear practice indicating ratification and acceptance of HPD's patterns, practices, customs and/or procedures of the excessive force used regularly and often by its Officers.

198. This practice, though unwritten, is so widespread and such a ubiquitous custom that is rises to have the force of law as a policy.

199. This policy has been promulgated by policymakers and decision makers of the City of Houston and the City of Houston Police Department, but ultimately include the then Houston Police Chief Art Acevedo, with whom "the buck stopped."

200. Chief Acevedo promulgated this policy of excessive force that is and was widespread in Houston indicating ratification and acceptance of HPD's patterns, practices, customs and/or procedures of the excessive force.

201. The Plaintiff was grievously injured as a direct result of Chief Acevedo's and HPD's patterns, practices, customs and/or procedures of excessive force and emboldened HPD Officers to use excessive force without fear of discipline.

202. This policy has been adopted with deliberate indifference by these policymakers.

203. These incidents are sadly commonplace.  For example, between just December 2004 and June 2007, Houston Police Department officers used Tasers 1,284 times.

204. From 2000 to 2007, the Houston Police Department used firearms to cause at least 53 citizen deaths and at least 97 citizen injuries.

205.   All of this was well known to the Defendant Officers and the Defendant City of Houston

206.   Defendant Officers knew that Officers are almost never disciplined for excessive force.

207.   These incidents, their ubiquity, gave rise to a widespread practice so persistent and so pervasive to have the force of law.

## V. CAUSES OF ACTION

### Against Defendant Officers

***Violations of 42 U.S.C. Section 1983 – Excessive Force in Violation of Plaintiff's Fourth and Fourteenth Amendment Rights.***

208.   Plaintiffs hereby fully incorporate the preceding paragraphs by reference.

209.   Defendant Officers, while acting within the course and scope of their individual capacities as City of Houston Police Officers, and acting pursuant to the training and policies of Defendant City of Houston, deprived Plaintiff of clearly established rights secured to him by the Constitution of the United States of America. Defendant Officers brutally and using excessive force assaulted Plaintiff without adequate provocation from Plaintiff. Defendant Officers' conduct showed conscious indifference to a right to be free of unreasonable seizures, as guaranteed by the Fourth Amendment to the Constitution of the United States and incorporated against the States and their subdivisions by the Fourteenth

Amendment to the Constitution of the United States, which was well-known to Defendant Officers at the time. Plaintiff suffered nearly fatal injuries that were clearly a result of Defendant Officers' excessive and unreasonable actions.

210.   Plaintiff showed no threat to officers or the public when he was incapacitated. No reasonable officer or person in Defendant Officers' position would have thought the force brought to bear was necessary to prevent imminent harm to him or the public.

211.   Defendant Officers' actions constitute conscious indifference to Plaintiff's rights under the Fourth Amendment to the Constitution of the United States and incorporated against the States and their subdivisions by the Fourteenth Amendment to the Constitution of the United States. Their conscious indifference to those rights were the proximate causes of Plaintiff's injuries. The force Officer Officers used were greatly in excess of what the situation required, and their actions were shocking to the public.

212.   Defendant Officers' actions were taken pursuant to customs and practices of the Houston Police Department that are so widespread as to have the force of law.

### Against Defendant City of Houston

***Violations of 42 U.S.C. Section 1983 –
Policy and Procedures of Excessive Force***

213.   Plaintiffs hereby incorporate the preceding paragraphs by reference.

214.   Defendant City of Houston has a policy of using excessive force,; this is clear from the reactions of the other police officers that were present while Defendant Officers were assaulting Plaintiff. Not one of the officers present prevents any Defendant from repeatedly assaulting Plaintiff, even while he lie motionless on the ground. Defendant City of Houston may not have had a written policy authorizing excessive use of force, but it is apparent that all of the foregoing were standard operating procedures for the Defendants. By tacitly approving of these violations and by its proclivity to "turning a blind eye," so to speak, to gross violations of clearly established constitutional rights, Defendant City of Houston created a policy of brutality and of excessive force. This practice is so pervasive as to have the force of law.

215.   This policy of brutality and excessive force demonstrates a conscious indifference to the clearly established constitutional rights secured to any person under the Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States. The foregoing policies were the producing and proximate causes of Plaintiff's injuries.

216.   Excessive force was so pervasive and widespread among HPD officers that it had the force of law as an unwritten policy and custom.   The foregoing myriad incidents establish this.   And while not every incident had perfect similarity with that suffered by Plaintiff, they all went to establishing the culture

and policy in which Defendant Officers acted with impunity to grievously injure Plaintiff unnecessarily and the use of excessive force.

217.   This policy was promulgated by policymakers up to and including then HPD Chief Art Acevedo.

218.   And this policy was the moving force behind Defendant Officers' actions.  Without this policy, they would not have behaved the way they did.  This policy, of engaging in and tolerating excessive force and brutality, proximately caused the incident.

219.   Deliberate indifference to Plaintiff's rights were shown.  This has been shown by the dozens and dozens of previous incidents, and that no discipline has been shown to them.  Tacit approval has occurred, and an inference may be made that such activities were in accordance with unwritten policy and custom.

### *Violations of 42 U.S.C. Section 1983:* <br> *Policy and Procedure: Failure to Properly Train*

220.   Plaintiffs hereby fully incorporate the preceding paragraphs by reference.

221.   Defendant City of Houston failed to adequately train its officers in the following areas:

        a.      Proper escalation of force;

        b.      the use of excessive force;

        c.      the illegality of excessive force;

d.    the constitutional limits of the use of force;

e.    the necessary and proper limits of force in a tense situation;

f.    how to negotiate with an unwell detainee;

g.    use of lethal force;

h.    how to avoid using lethal force;

i.    appropriate de-escalation;

j.    avoiding needless incapacitation;

k.    avoiding needless use of a firearm;

l.    avoiding cruel and unusual punishment;

m.    avoiding putting knees on necks; and

n.    the use of unnecessary excessive force while detainees are handcuffed and hogtied.

222.   The policy of failing to adequately train its officers shows a deliberate indifference to the rights secured by the Fourth and Fourteenth Amendments to the Constitution of the United States to the citizens and people of Harris County, Plaintiff in particular. Defendant City of Houston's failure to properly train its officers is so reckless that misconduct by its officers was inevitable. The policy of inadequate training was a producing and proximate cause of Plaintiff's injuries, and is so pervasive as to have the force of law.

223.   This policy was promulgated by policymakers up to and including then HPD Chief Art Acevedo.

224.   And this policy was the moving force behind Defendant Officers' actions.  Without this policy, they would not have behaved the way they did.  This policy, failing to properly train, proximately caused the incident.

225.   Deliberate indifference to Plaintiff's rights were shown.  This has been shown by the dozens and dozens of previous incidents, and that no discipline has been shown to them.  That is because there was simply no training to behave any differently.

## VI. DAMAGES

226.   As a result of the occurrence that forms the basis of this lawsuit, as stated above, and as a direct and proximate result of Defendants' wrongful and unconstitutional acts, Plaintiff suffered serious injuries and was paralyzed, will likely sustain additional serious damages in the future, and is entitled to recover:

        a.     mental anguish;

        b.     physical pain;

        c.     physical suffering;

        d.     mental or emotional pain or anguish;

        e.     loss of consortium;

        f.     disfigurement;

g.     physical impairment;

h.     loss of companionship;

i.     loss of society;

j.     inconvenience;

k.     loss of enjoyment of life;

l.     injury to reputation;

m.     all other nonpecuniary damages as may be supplemented; past medical bills and expenses incurred as a proximate result of the occurrence made the basis of this suit;

n.     loss of income and wages;

o.     loss of earning potential;

p.     loss of household services;

q.     all other pecuniary damages as may be supplemented;

r.     exemplary damages;

s.     costs of court;

t.     expert fees;

u.     necessary and reasonable attorney's fees;

v.     pre-judgment interest;

w.     post-judgment interest; and

x.     all other miscellaneous damages as may be supplemented.

## VII. EXEMPLARY DAMAGES

227.  Plaintiff hereby fully incorporates the preceding paragraph by reference as if fully stated herein.

228.  Plaintiff would further show that the above-described acts and omissions of Defendants were committed with reckless and callous indifference to the federally protected rights of others, namely Plaintiffs, and was motivated by an evil intent.   Thus, Plaintiff pleads to the fullest extent allowable under 42 U.S.C. § 1983 their right to recover exemplary and punitive damages.

## VIII. EXPERT FEES

229.  Plaintiff is further entitled to receive expert fees, pursuant to 42 U.S.C. § 1988.

## IX. ATTORNEY'S FEES

230.  Plaintiff is further entitled to receive reasonable and necessary attorney's fees, pursuant to 42 U.S.C. § 1988.

## X. JURY DEMAND

231.  Plaintiff hereby demand a trial by jury and the appropriate fees has been tendered.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that Defendants answer the allegations herein, and upon trial thereof, Plaintiff has

and recovers judgment against Defendants for all damages and injuries suffered and incurred, for pre-judgment interest, for interest on the judgment, for court costs, and for all other such relief, both in law and in equity, to which the Honorable Court establishes Plaintiff is justly entitled.

Respectfully submitted,

**ROBERTS MARKLAND LLP**

By:    */s/ Sean A. Roberts*
Sean A. Roberts
Texas Bar No. 00797328
Fed. Bar ID No. 21877
Clive Markland
Texas Bar No. 24027475
Fed. Bar ID No. 585658
Johnny P. Papantonakis
Texas Bar No. 24032927
Fed. Bar ID No. 30065
Rob O. Cantu
Texas Bar No. 24094580
Fed. Bar ID No. 3180919
2555 N. MacGregor Way
Houston, Texas 77004
Telephone (713) 630-0900
Facsimile (713) 630-0991
Email: sr@robertsmarkland.com
Email: cm@robertsmarkland.com
Email: jp@robertsmarkland.com
Email: rc@robertsmarkland.com
Email: nh@robertsmarkland.com
Email: eservice@robertsmarkland.com

**Attorneys for Plaintiffs**

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule 5(b) of the Federal Rules of Civil Procedure, and further pursuant to Local Rule 5.3 of the Local Rules of the United States District Court for the Southern District of Texas, I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record via the Court's electronic filing system on the 21st day of June, 2022.

<span style="padding-left:3em"></span>*/s/ Rob O. Cantu*
<span style="padding-left:3em"></span>Rob O. Cantu